OPINION OF THE COURT
Kenneth R. Fisher, J.
This is an action brought by a general contractor (LeCesse) against a subcontractor (Kozel) for damages resulting from the subcontractor’s failure to perform work on a project for which it had submitted an oral bid. The general contractor seeks *760 recovery under theories of breach of contract and promissory estoppel. The subcontractor moves for summary judgment. For the following reasons, Kozel’s motion for summary judgment is granted and the complaint is dismissed.
BACKGROUND
In September of 1992, LeCesse prepared to bid on the so-called Omega Upgrade Project, a multimillion dollar renovation of an existing building at the University of Rochester. LeCesse requested a number of subcontractors to bid for various parts of the job. Kozel, a subcontractor in the business of supplying steel products to the construction trade, submitted bids to LeCesse in response to the solicitation. Kozel supplies both structural steel, called "Division 5” work, and reinforcing steel, called "Division 3” work. Kozel submitted a written bid to LeCesse for the Division 3 reinforcing steel work on the Omega project. This Division 3 bid is relevant, but not directly implicated by the complaint. Kozel also submitted an oral bid of $55,000 for the Division 5 structural steel work on the project.[1] LeCesse incorporated the figures received from Kozel for the Division 3 work and the Division 5 work into its final bid for the general contract, and was subsequently awarded the contract by the University of Rochester.
On October 7, 1992, shortly after the award, LeCesse employee Daniel Lanni telephoned Jeffrey Loeffler of Kozel and advised him that LeCesse was awarded the general contract for the Omega project. Lanni then told Loeffler that he "would like to talk to them about doing a deal for both the reinforcing and the structural steel.” When asked at his deposition *761 whether he told Loeffler that Kozel was awarded the subcontract, Lanni conceded that he did not. Lanni testified that the "deal” he envisioned was "an agreement on price and scope for both divisions and write a contract.” The subcontract contemplated might "possibly” involve a change in scope or price for each division, but Lanni’s purpose, according to his testimony, "was to do both structural and reinforcing [steel] together” and "[c]ome to an agreement” with Kozel.
At the time, Loeffler was unaware that Kozel submitted an oral bid for the Division 5 structural steel work, and therefore he told Lanni that someone from Kozel would get back to him. Shortly thereafter, Raymond Benoit, vice-president of Kozel, called Lanni. Benoit advised Lanni that Kozel would not perform the work, and Benoit explained his reasons for the refusal. Lanni told Benoit that LeCesse had relied upon their bids and, therefore, it was too late for Kozel to refuse the work.
On October 13,1992, Lanni sent Kozel a letter that purported to serve as a letter of intent to enter into LeCesse’s "standard” form of contract for Division 5 work as bid by Kozel on September 29, 1992, and as a notice to proceed with the preliminary work pending receipt of the contract. In the letter, Kozel was instructed to sign and return a copy to LeCesse. Kozel did not sign the letter, because it contained a waiver of its right to file a mechanic’s lien and also required Kozel to purchase additional insurance, and Kozel again notified LeCesse that it would not perform the work under the new terms demanded.
Because Kozel refused to perform the work, LeCesse was required to hire another subcontractor at a higher price. LeCesse brought this action to recover the difference between Kozel’s bid and the amount paid by LeCesse to the substitute subcontractor.
BREACH OF CONTRACT CLAIM
[The portion of the opinion analyzing whether there was an acceptance of the bid at the time Lanni spoke with Loeffler, or subsequently when Lanni sent Kozel the so-called letter of intent, and concluding that there was no agreement under traditional principles of contract law, has been deleted for purposes of publication.]
PROMISSORY ESTOPPEL CLAIM
The second cause of action is based on the theory of promissory estoppel. Recovery under this theory is not dependent on *762 the existence of a contract or the particulars of consideration in the classic sense. A promissory estoppel action, in contexts in which it is recognized, arises out of a breached promise in circumstances under which it is fair to hold the promisor to the terms of his promise. (Restatement [Second] of Contracts § 90 [1] ["A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise”].) The doctrine is often thought of in terms of detrimental reliance, but more recently has been seen as grounded in a theory of promise (see generally, Yorio & Thel, The Promissory Basis of Section 90, 101 Yale LJ 111 [1991]), which has found more general application to the law of contracts in Fried, Contract as Promise (1981). (See also, Gold-stick v ICM Realty, 788 F2d 456, 463-464 [7th Cir 1986] [Posner, J.] ["the value of the promise is the presumptive measure of damages for promissory estoppel, to be rejected only if awarding so much would be inequitable”]; cf, Gordley, Enforcing Promises, 83 Cal L Rev 547, 568-569, 612-613 [1995] [for exploration of a third so-called Aristotelian theory based on a principle of equality].)
Applied to commercial or business settings like this one, two leading and much discussed cases present contrasting views on the applicability of the doctrine. (Compare, Baird Co. v Gimbel Bros., 64 F2d 344, 346 [2d Cir 1933] [Hand, J.] [rejecting promissory estoppel as a basis for subcontractor liability to the general in the bidding context], with Drennan v Star Paving Co., 51 Cal 2d 409, 333 P2d 757 [1958] [promissory estoppel is available to bind the subcontractor to its bid used by the general contractor to obtain the prime contract]; see generally, Feinman, Promissory Estoppel & Judicial Method, 97 Harv L Rev 678, 680-681, 692-694, 700-701 [1984]; Knapp, Reliance in the Revised Restatement: The Proliferation of Promissory Estoppel, 81 Colum L Rev 52, 63-64 [1981]; Kessler & Fine, Culpa In Contrahendo, Bargaining in Good Faith, and Freedom of Contract: A Comparative Study, 77 Harv L Rev 401, 422-424 [1964] [all discussing the James Baird Co.-Drennan debate].)
In New York, promissory estoppel has had only tentative application. (Farash v Sykes Datatronics, 59 NY2d 500, 510, 511 [1983] [Jasen, J., dissenting] ["promissory estoppel, a theory which * * * this court has heretofore declined to adopt”]; Weiner v McGraw-Hill, Inc., 57 NY2d 458, 465, n 6 [1982]; Allegheny Coll, v National Chautauqua County Bank, 246 NY *763 369, 373-375, 379 [1927].)[2] The Court of Appeals has not adopted it explicitly, and has had no occasion to apply it in the construction contract context, but at least two trial courts have employed it to grant recovery to a general contractor. (Nory Constr. Co. v Genesee LeRoy Stone Corp., Sup Ct, Monroe County, Feb. 5, 1993, index No. 1499/92, mod 207 AD2d 969 [4th Dept 1994]; King & Son v De Santis Constr., 97 Misc 2d 1063 [Sup Ct, NY County 1977], mod 65 AD2d 695 [1st Dept 1978], Iv granted 47 NY2d 709 [1979], appeal dismissed [unreported rules dismissal (Mar. 18, 1980)]; but cf., Joy Co. v Noise Control Prods., 111 Misc 2d 64, 65 [Sup Ct, Onondaga County 1981].)
The Appellate Divisions recognize the theory as supporting a cause of action, at least in the abstract. "Promissory estoppel is made out by 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.’ ” (Chemical Bank v City of Jamestown, 122 AD2d 530, 531 [4th Dept 1986] [quoting Ripple’s of Clearview v Le Havre Assocs., 88 AD2d 120, 122 [2d Dept 1982]; see also, Cyberchron Corp. v Calldata Sys. Dev., 47 F3d 39, 44 [2d Cir 1995] [collecting cases].) Except for the summary affirmance in King & Son (supra), the Appellate Divisions have been, for the most part, silent on promissory estoppel’s application to the bidding context.
An examination of the few cases in this State applying promissory estoppel in subcontractor bid cases leaves substantial doubt whether indeed it may provide a basis for recovery. In Nory, Special Term granted summary judgment to the general contractor on a promissory estoppel theory, relying on Drennan v Star Paving Co. (supra), and the New York case of King & Son (supra). The Appellate Division, however, reversed on the ground that the general contractor only submitted conclusory evidence that it "reasonably relied” on the subcontractor’s bid. The Court found that the bid documents submitted to the *764 State should, have been examined to determine whether, indeed, the general contractor used the defendant subcontractor’s bid in preparing its own bid to the State. (Nary Constr. Co. v Genesee LeRoy Stone Corp., supra, 207 AD2d, at 969.) We must presume, because the Court’s opinion does not otherwise reveal why the bid documents must be examined, that evidence of the general contractor’s use of some other subcontractor’s bid would be enough to defeat the promissory estoppel claim, on the ground, again presumably, that the subcontractor’s bid did not induce action or forbearance on the part of the general contractor.
In any event, the Appellate Division’s opinion does not explicitly inform whether Special Term’s promissory estoppel theory was embraced for the construction contract bidding context, and another sentence in the opinion leaves substantial doubt of the answer. The Court stated: "Plaintiff indicated that, before submitting that document to the State, it did not inform defendant that it intended to accept defendant’s bid.” (Nory Constr. Co. v Genesee LeRoy Stone Corp., 207 AD2d, at 969, supra.) Emphasizing the issue whether the general contractor communicated to the subcontractor an intention to accept the latter’s bid before an award of the prime contract betrays the Court’s apparent unwillingness to accept pure promissory estoppel as a basis for recovery by the general contractor, and recalls the same Court’s earlier emphasis, after citing the two leading cases discussed above presenting contrasting views on the subject, on an "act of’ acceptance "communicated to the offeror”. (Rochester Plumbing Supply Co. v A. Burgart, Inc., 49 AD2d, at 82, supra [citing Baird Co. v Gimbel Bros., supra, and Drennan v Star Paving Co., supra].) These are not the words of promissory estoppel.[3]
*765 Fortunately, because it is generally not for trial level courts to first declare the applicability of a new legal theory to a class of cases, a decision predicting whether New York’s appellate courts will eventually apply promissory estoppel to a general contractor’s dispute with a subcontractor in the bidding context is unnecessary. Even if promissory estoppel is applied on the facts which this court must accept for purposes of this motion, plaintiff’s cause of action fails as a matter of law. There is undisputed evidence of a clear and unambiguous promise or bid by Kozel. There also was evidence, which we must accept for purposes of this motion, of reasonable and foreseeable reliance upon the bid by LeCesse when it tendered its bid for the prime contract. But the evidence of reliance, from LeCesse’s own account at Lanni’s deposition, also showed that, by the time LeCesse notified Kozel of the award of the prime contract, LeCesse no longer was relying on Kozel’s oral bid in any functional sense contemplated by section 90 of the Restatement. LeCesse wanted another contract with different terms, consolidating the Division 5 work with the Division 3 work, and at a more favorable price.
The cases supporting application of promissory estoppel in this context uniformly deny relief to a general contractor who engaged in the peculiar conduct conceded by LeCesse to have occurred here. The leading case, Drennan v Star Paving Co. (51 Cal 2d 409, 333 P2d 757 [1958], supra), denies promissory estoppel when the general contractor "delay[s] acceptance after he has been awarded the general contract in the hope of getting a better price.” (51 Cal 2d, at 415, 333 P2d, at 760 [adding: "Nor can he reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer”].) Other cases are in accord, and have described what LeCesse did here as "bid chiseling”. (Preload Tech, v A.B. & J. Constr. Co., 696 F2d 1080, 1089 [5th Cir 1983] [when bid chiseling is engaged in, i.e., "refer[ring] to the general contractor’s attempt to negotiate a lower price than that bid[,] * * * recovery by the general contractor under § 90 may be denied on a variety of theories, viz: that the general contractor did not in fact rely on the subcontractor’s bid, or failed to accept it within a reasonable time, or rejected it by a counteroffer, or, *766 perhaps more persuasively, because in such circumstances there is a failure to meet § 90’s requirement that 'injustice can be avoided only by enforcement of the promise’ ”]; Debron Corp. v National Homes Constr. Corp., 493 F2d 352, 358 [8th Cir 1974] ["a contractor should not be free to delay acceptance after he has been awarded the general contract in hopes of getting a better offer” nor may a contractor "attempt to reopen bargaining with the subcontractor”]; Haselden-Langley Constructors v Farr & Assocs., 676 P2d 709, 711 [Colo Ct App 1983] ["(A)n attempt to accept the bid on terms different from the original bid is evidence of lack of reliance” as is "evidence that the general contractor continued to bargain with the subcontractor or failed to rely promptly after the award of the general contract”]; Leavell & Co. v Grafe & Assocs., 90 Idaho 502, 514, 414 P2d 873, 878-879 [1966] ["because the parties’ communications amounted to no more than continued negotiations, the doctrine of promissory estoppel is not applicable”].) This limitation on the promissory estoppel doctrine in subcontractor cases has found explicit mention in the revised edition of Professor Corbin’s treatise on Contracts. "[I]t is generally agreed that the general contractor cannot, after being awarded the contract, reopen the bidding with the subcontractors to chisel down the bids, while at the same time maintaining that the low-bidding subcontractor remains liable.” (1 Corbin, Contracts § 2.31, at 292 [rev ed 1993].)[4]
It is possible that Lanni’s effort to "chisel” or do a consolidated "deal” with Kozel is insufficient, by itself, to "show that he did not rely on it [Kozel’s bid].” (Goldstick v ICM Realty, 788 F2d, at 463, supra.) Lanni may have, in fact, regarded Kozel’s oral bid "as a floor” (788 F2d, at 463) or relied on it as a fall-back position if he was not successful in getting Kozel to agree to his terms. But the situation and context in Goldstick, in which a triable issue was found on such a "plausible” scenario (788 F2d, at 463), is much different than the dynamics at play here. The cases cited above establish that, if such reliance there was, it would not be reasonable in the bidding context as a matter of law. In any event, the subsequent events show that Lanni did not regard it as a "floor” or fail-back position, *767 because he tried in his letter to extract new and onerous terms from Kozel that he knew from prior experience would not be accepted. There are no triable issues precluding summary judgment on the second cause of action.
CONCLUSION
By reasons of the foregoing, defendant’s motion for summary judgment dismissing the complaint is granted.

. The parties differ on how Kozel presented its "bid” for the Division 5 work. LeCesse claims that Kozel submitted an oral bid over the telephone on September 29, 1992, which was the final day LeCesse permitted subcontractors to submit bids. Kozel maintains that the figure provided to LeCesse was merely budgetary in nature — a courtesy figure given to the general contractor to help him make an estimate of costs. For the purposes of this motion, it is assumed that the figure constituted an oral bid, as LeCesse contends. On a summary judgment motion such as this, the court must view the evidence, and all legitimate inferences to he drawn therefrom, in favor of the party opposing the motion. (Rizk v Cohen, 73 NY2d 98, 103 [1989] ["accepting plaintiff’s version of the facts as we must on this summary judgment motion”]; Gadley v U.S. Sugar Co., 210 AD2d 983, 984 [4th Dept 1994].) Once the facts are so found in favor of the nonmoving party, "the question of whether a contract existed between the parties is an issue of law for the court.” (Rochester Plumbing Supply Co. v A. Burgart, Inc., 49 AD2d 78, 81 [4th Dept 1975]; see also, Gupta v University of Rochester, 57 AD2d 731 [4th Dept 1977].)

. In Brown Bros. Elec. Contrs. v Beam Constr. Corp. (41 NY2d 397, 401 [1977]), the Court of Appeals found an unwritten contract between the owner of a project and a subcontractor from evidence of the parties’ course of conduct and, in part, from the "detriment to” the subcontractor "in continuing the work and the benefit to” the owner "in having it done.” (Citing 1 Corbin, Contracts, §§ 122, 124 [1963].) But, as the citations to Corbin’s original treatise demonstrate, the result can be explained by classical contract law and the definition of consideration without resort to promissory estoppel theory. Farash (supra) is more properly seen as a case in quasi contract, not promissory estoppel as Judge Jasen feared (quoted above).

. For this reason, there is substantial difficulty with accepting the apparent reasoning in King & Son v De Santis Constr. (supra) that Rochester Plumbing Supply (supra) is based on promissory estoppel. (97 Misc 2d, at 1067.) Not mentioned in De Santis was the emphasized fact in Rochester Plumbing Supply that an acceptance had been communicated to the subcontractor and that therefore recovery was based on classical theories of contract breach. The Court of Appeals granted review in King & Son, but the appeal evidently was dismissed. In a third case, the following was stated: "A general contractor often must rely upon oral offers to perform subcontract work so that knowledgeable bids on the general contract may be timely submitted based upon clearly accurate estimates of the cost of subcontracting.” (Carlin Constr. Co. v Whiffen Elec. Co., 66 AD2d 684 [1st Dept 1978].) Although this statement expresses part of the rationale of the promissory estoppel cases, it is clear from the Court’s opinion that the case explicitly *765 was decided in classical contract terms without reference to promissory estoppel. (66 AD2d, at 684-685.) The Court of Appeals has warned that many cases claimed to be based on promissory estoppel theory are, in fact, entirely explainable by reference to conventional contract law. (Weiner v McGrawHill, Inc., 57 NY2d 458, 465, n 6 [1982], supra.)

. The practice described by the treatise reviser in the above-quoted text really is "bid shopping” among those subcontractors who competed for the particular subcontract, not bid chiseling. (Preload Tech. v A.B. & J. Constr. Co., 696 F2d, at 1089, supra.) Bid shopping is not involved here, but the cases the reviser cites for the quoted proposition also involve the conduct here at issue, chiseling with the subcontractor intended for the job on issues of price and scope of work. (See, 1 Corbin, Contracts § 2.31, at 292, n 12.)